Jeffrey A. Cogan, Esq.
Nevada Bar No. 4569
JEFFREY A. COGAN, ESQ., LTD.
6900 Westcliff Drive, Suite 602
Las Vegas, Nevada  89145
Telephone: (702) 474-4220
Facsimile:  (702) 474-4228
E-mail: jeffrey@jeffreycogan.com
Attorney Plaintiff, Robert M. Ross

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT M. ROSS, an individual, <br><br>         Plaintiff, <br><br> vs. <br><br> STEPHEN BROWN, an individual, MARY BROWN, an individual, UMII HOLDINGS, INC., a Hawaiian corporation and DOES 1 through 5, inclusive, <br><br>         Defendants. | Case No.: <br><br> **COMPLAINT FOR VIOLATION OF 15 U.S.C. §77a, et seq., SECURITIES FRAUD, CIVIL RICO [18 U.S.C. § 1964]** <br><br> **[JURY DEMAND]** |

NOW COMES Plaintiff, Robert M. Ross, by and through his attorney, Jeffrey A. Cogan, Esq. who complains against Defendants and each of them as follows:

### ALLEGATIONS OF JURISDICTION AND VENUE

1.  Plaintiff, Robert M. Ross is a citizen and resident of the State of California, County of Los Angeles.

2.  Defendant Stephen Brown was, at all times herein mentioned a resident of the State of Nevada, residing in Henderson, Nevada and doing business in the State of Nevada.  Plaintiff is informed and believes and thereon alleges that, upon Plaintiff learning of the facts constituting the fraud herein alleged, Defendant Stephen Brown fled the State of Nevada and moved to the United Kingdom.  Plaintiff is informed and believes and thereon alleges that Defendant Stephen Brown is now a

resident of the United Kingdom whereto he fled to avoid liability and prosecution for the acts herein alleged.

3. Mary Brown is now, and at all times mentioned herein was the lawful wife of Stephen Brown and at all times herein stated was a resident of the State of Nevada, residing in Henderson, Nevada.  Plaintiff is informed and believes and thereon alleges that Defendant Mary Brown was a co conspirator with Stephen Brown in all of the acts and representations herein set forth.  Plaintiff is further informed and believes and thereon alleges that Mary Brown was a co owner, manager, officer and director of the corporate entity UMII Holdings, Inc., and other corporate entities through which Defendant Stephen Brown operated.

4. Plaintiff is informed and believes and thereon alleges that the corporate entity UMII HOLDINGS, Inc. was a Hawaiian corporation through which Defendants Stephen Brown and Mary Brown engaged in acts in violation of 18 U.S.C. § 1964, including, but not limited to wire fraud in violation of 18 U.S.C § 1343 and that said entity was a "corrupt organization" as that term is defined by law.

5. This U.S. District Court has jurisdiction pursuant to 28 U.S.C.§ 1331 in that the action involves claims against the Defendants for securities fraud in violation of 15 U.S.C. § 77a et seq., and "Civil Rico" in violation of 18 U.S.C. § 1964.

6. This venue is the proper venue for this action by reason of the fact that Defendants conducted their affairs in this district; the misrepresentations constituting the violations of 15 U.S.C. § 77a, et seq. and The Securities and Exchange Act of 1934, § 10 b  were made to Plaintiff from this district; the Defendant sent, by wire transfer (in the form of email and email attachments), the fraudulent misrepresentations to Plaintiff from this district; the Defendant received Plaintiff's funds in this district; and the corporate shares for which Plaintiff delivered funds to

Stephen Brown were to be delivered to Plaintiff from this district.

## GENERAL ALLEGATIONS OF UNDERLYING FACTS

7.  Plaintiff is informed and believes that Defendant Stephen Brown, in order to obtain funds from Plaintiff and other investors, made false and fraudulent misrepresentations in connection with the sale of securities in violation of 15 U.S.C. § 77a, et seq. and in violation of The Securities and Exchange Act of 1934, § 10b.  Said representations were made through interstate commerce through the use of the internet and telephone.

8.  Plaintiff is informed and believes that the representations made by Stephen Brown to Plaintiff through vehicles of interstate commerce, including but not limited to the internet, emails and the telephone included, but were not limited to the following:

    a.    That Stephen Brown formed a corporate entity by the name of UMII Holdings, Inc., a Hawaiian corporation which would issue shares to Plaintiff pursuant to Subscription Agreements upon the investment of funds therein; and

    b.    That Stephen Brown had a Trademark Licence Agreement to use a newly developed all natural sweetener owned by Tate & Lyle, a United Kingdom corporation (a copy of which is attached hereto as Exhibit "1" hereof and incorporated hereat by this reference); and

    c.    That Stephen Brown had a formula for various drinks using the all natural sweetener and a line of beverages which included sports drinks, nutritional supplement drinks, energy drinks and other beverages all using exclusive formulas and based upon the all natural non caloric sweetener for which he held the exclusive U.S. Licence from Tate & Lyle (Exhibit "1").

d.      That the beverage lines were unique in that they were the first such products to be available to diabetics who, due to their medical conditions, could not consume the typically marketed energy drinks due to the sugar content therein and that because of such unique character and quality of the beverages, The American Diabetes Association accepted Stephen Brown as a "Professional Member" and the United States Department of Agriculture issued a "Certificate of Appreciation" to Stephen Brown in connection with its "Center for Nutrition Policy and Promotion".

e.      That UMII Holdings, Inc. had secured the U.S. rights to a product known as Lucozade which is owned by Glaxo, Smith, Kline, a U.K. Corporation which would be exclusively marketed in the U.S. by Stephen Brown's company.

9.   In furtherance of the fraudulent misrepresentations, Stephen Brown  sent copies of documents, purporting to be emails from himself and representatives of Tate & Lyle verifying the existence of the exclusive rights and a copy of an agreement purporting to be an exclusive rights agreement between Stephen Brown through his corporation, UMII Holdings, Inc. and Tate & Lyle.

10.  The representations made by Stephen Brown to Plaintiff were made in or about January 1, 2012, and were intended to induce an investment by Plaintiff in UMII Holdings, Inc.  In reliance upon the veracity of said representations Plaintiff was induced to and did invested $25,000.00 for 557,000 shares of UMII Holdings, Inc. Attached hereto as Exhibit "2" hereof and incorporated hereat by this reference is a true copy of the Subscription Agreement of UMII Holdings, Inc. for 485,000 shares and attached hereto as Exhibit "3" hereof and incorporated hereat by this reference is a true copy of the Subscription Agreement of UMII Holdings, Inc. for 72,000.00 shares.

11. The shares purchased by Plaintiff were never delivered to Plaintiff notwithstanding numerous requests therefore.

## FIRST CAUSE OF ACTION

### FOR SECURITIES FRAUD IN VIOLATION OF 15 U.S.C. §77a, et seq.

12. Plaintiff incorporates by this reference each, all and every allegation set forth in paragraphs 1 through 11 hereof as though set forth again in full.

13. On or about January 26, 2012, Plaintiff, in reasonable reliance upon the representations made by Defendant Stephen Brown, invested $25,000.00 upon the express written agreements to provide and deliver 557,000 shares of UMII Holdings, Inc. as reflected in the Subscription Agreements attached hereto as Exhibits "2" and "3".

14. Defendants Stephen Brown and UMII Holdings, Inc. never delivered the shares as promised but instead represented that the company was going to "go public" and that the shares would be issued by the stock transfer agent, Pacific Stock Transfer, a Nevada Corporation.

15. Defendant Stephen Brown made the representations set forth in paragraph 8 a. through e. with full knowledge that the said representations were false and that they were known to be false when made.  The truth, known to Defendants Stephen Brown and Mary Brown was that there was no "Exclusive" agreement with Tate & Lyle and that the document sent to Plaintiff via email by Stephen Brown (Exhibit 1") was a false and fraudulent document.  Further, that there were no "formulas" for the use of the sweetener which could be made into an energy, nutritional, of other beverage which could be consumed by diabetics.  Further, that neither Defendants Stephen Brown, Mary Brown nor UMII Holdings, Inc. ever intended to deliver 557,000 shares as provided for in the Subscription Agreements executed

by Stephen Brown and Plaintiff.

16. Plaintiff first learned of facts that the representations of Stephen Brown and UMII Holdings, Inc. were false and fraudulent occurred in or about September, 2012 when Plaintiff first communicated with Mr. Joe Warne, who had been working with Stephen Brown and who informed Plaintiff that the contracts represented by Stephen Brown were false, that there were no formulas for beverages, that Stephen Brown had utilized all or nearly all of the funding invested in UMII Holdings, Inc. for his personal use and the use of his wife, Defendant Mary Brown, and that all of the representations made by Stephen Brown were part of an ongoing fraud being perpetrated against investors and others, including Tom Danielson and Cytosport, Inc. (each of whom have subsequently sued Stephen Brown in U.S. District Court as case numbers 1:13BCV 01127RBJ, U.S. District Court District of Colorado (Denver), and 2 12 CV 01546 LDG, U.S. District Court, District of Nevada (Las Vegas), respectively).

17. Plaintiff is informed and believes and thereon alleges that Defendant Stephen Brown knew, at all times, that the representations made to Plaintiff were made solely for the purpose of securing Plaintiff's money and were false and fraudulent and that they were made for the sole and express purpose of defrauding Plaintiff. Stephen Brown knew that:

   a.    The document purporting to be a Trademark Licence Agreement from Tate & Lyle (Exhibit "1") was a false and fraudulent document and that he did not have any rights to the all natural sweetener as represented; and that there were no formulas owned by UMII Holdings, Inc, which could be used to manufacture an energy drink which could safely be marketed to diabetics as represented; and that there would be no shares issued in consideration for the

funds delivered to Stephen Brown in accordance with the Subscription Agreements (Exhibits "2" and "3").

b.      UMII Holdings, Inc. was solely owned by Defendants Stephen Brown and Mary Brown and that no shares were ever issued by the corporation to any other person or entity nor would they be.

c.      That the entire business as represented to Plaintiff was a sham and a fraud and that none of the representations made by Stephen Brown would or possibly could ever come to fruition because he did not have the products, funding or formulas to make the products.

d.      That UMII Holdings, Inc. was not "going public" and that Pacific Stock Transfer was not going to act as the "stock transfer agent" for the issuance of the shares.

e.      That Glaxo Smith Kline had no contract with Stephen Brown or any of his entities for the distribution of Lucozade products in the U.S.

18.  In furtherance of the fraud perpetrated by Defendant Stephen Brown, on or about March 5, 2012, when Plaintiff requested that Defendant provide the promised shares, Defendant Stephen Brown, represented that the company was going public and the shares were to be issued through Pacific Stock Transfer, a local Nevada corporation. Stephen Brown further represented that UMII Holdings, Inc. had formed a wholly owned subsidiary company by the name of "ALL SPORTS ENERGY DRINKS, INC." and that said entity had entered into a contract with Clear Channel which owned the television distribution rights to broadcast the Los Angeles Dodgers baseball games for the 2012 baseball season.  Attached hereto as Exhibit "4" hereof, and incorporated hereat by this reference is a true copy of the contract which Stephen Brown delivered to Plaintiff via attachment to an email

sent through interstate commerce on or about March 21, 2012, and which Stephen Brown represented to Plaintiff as being proof and evidence of the existence of such agreement.  Plaintiff later learned that the document was false and fraudulent and that no such agreement existed and that there was no contract between "ALL SPORTS ENERGY DRINKS, INC." and Clear Channel.  Plaintiff is informed and believes and thereon alleges that the representation was part of the overall scheme, design and plan to defraud Plaintiff, and others, into believing that there were products being manufactured, that there were contracts being preformed and that the business as represented by Stephen Brown was a viable and potentially profitable enterprise.

19.  The actual truth was that there was no business. There were no products.  There were no contracts.  There were no shares being issued. The company was not "going public" and that the funds were used by Stephen and Mary Brown for their own personal obligations and living expenses, including, but not limited to, the payment of private school for their children, the leasing of a Mercedes Benz automobile, membership in a health club for Mary Brown, the purchase of jewelry and other personal expenditures having no relationship to the operation of any business.  On or about September 19, 2012, Plaintiff communicated directly with Mr. Neil Laventure, an attorney at Glaxo Smith Kline, and ascertained that there was no Licence Agreement for the exclusive right to market Lucozade in the U.S.

20.  Plaintiff, by his reasonable reliance upon the representations of Stephen Brown and the documents delivered by Stephen Brown to Robert M. Ross transferred, conveyed and delivered to Stephen Brown the sum of $25,000.00 for which no shares were ever delivered.  The delivery of the funds was based entirely upon the false and fraudulent representations of Stephen Brown, without which Plaintiff

would not have delivered $25,000.00 to Stephen Brown. Plaintiff is informed and believes that the above set forth representations were made specifically with the intent to induce Plaintiff to invest money and were made with the specific intent to defraud Plaintiff out of the $25,000.00.

21.  As a direct and proximate result of the reliance by Plaintiff upon the false and fraudulent misrepresentations made to Plaintiff by Defendant Stephen Brown, Plaintiff has been injured and damaged in the sum of $25,000.00.

## SECOND CAUSE OF ACTION FOR CIVIL RICO

## AGAINST STEPHEN BROWN, MARY BROWN AND UMII HOLDINGS, INC.

22.  Plaintiff incorporates each, all and every allegation set forth herein at paragraphs 1 through 21 hereof as though set forth hereat again in full.

23.  Commencing in or about late 2011, Defendant Stephen Brown directly and specifically made representations to Plaintiff concerning the activities and projects of a company then known as UMII Holdings, Inc. Said representations were conveyed to Plaintiff via interstate commerce and consisted of telephone calls and emails.   The said emails and phone calls included, but were not limited to communications from November, 2011, December 2011, January 2012, to and including January 26, 2012. Said communications, telephone calls and email transmissions were false and fraudulent and were intended to, and did, result in the delivery of $25,000.00 from Plaintiff to Defendant, all in violation of 18 U.S.C. § 1341 and 1343.

24.  As part of a plan, scheme and devise to fraudulently obtain funds from Plaintiff, Defendant Stephen Brown commenced a series of contacts, communications and representations which were known by Defendant Stephen Brown to be false when made and which were specifically intended to secure moneys from Plaintiff under

false pretenses.

25.  Between November, 2011 and January 26, 2012, Defendants acting in consort with each other, represented that: (1) UMII  Holdings, Inc. had an exclusive contract with Tate & Lyle, a well known U.K. corporation for the exclusive U.S. rights to use its proprietary all natural sweetener; and (2) that UMII Holdings, Inc. also had various formulas for the production of beverages using the Tate & Lyle sweetener; and (3) that UMII Holdings, Inc. was going to "go public"; and(4) that $25,000.00 would enable Plaintiff to secure 557,000 shares of UMII Holdings, Inc. Said representations were made knowing that they were false and that they were intended to and did induce Plaintiff to deliver to Stephen Brown and his company the sum of $25,000.00.

26.  The representations and each of them were made with the intent to defraud Plaintiff and to induce the delivery of funds as herein above alleged and the delivery of said funds were made in reasonable reliance upon said representations.

27.  The representations, and each and all of them, were false when made and were known by Stephen Brown to be false when made.

28.  The truth, known to Stephen Brown but unknown to Plaintiff until in or about September 2012, was that neither Stephen Brown nor UMII Holdings, Inc. had any contracts with Tate & Lyle, nor did Stephen Brown or UMII Holdings, Inc. have any formulas for the development of any beverages using the Tate & Lyle formula, nor was UMII Holdings, Inc. going to "go public", nor would Stephen Brown or UMII Holdings, Inc. deliver any shares to Plaintiff.

29.  Plaintiff is informed and believes and thereon alleges that Defendant Stephen Brown engaged in more than two predicate acts in the furtherance of the scheme to defraud Plaintiff out of $25,000.00 in that Defendant Stephen Brown did send

emails containing copies of false documents to induce Plaintiff to transmit funds to Defendant Stephen Brown.  One such predicate act was a telephone call in or about December, 2011, in which Stephen Brown represented to Plaintiff that Stephen Brown had secured a contract with Tate & Lyle; a second predicate act consisted of remitting a copy of the purported Trademark Licence Agreement as a PDF attachment to an email sent from sbrown@umiiral.com to rross@khrlaw.com; a third predicate act was in the wire transmission of a PDF "Subscription Agreement" executed by Stephen Brown for the issuance of 485,000 shares of UMII Holdings, Inc.; a forth predicate act was the wire transmission of a PDF "Subscription Agreement" for the issuance of 72,000 shares of UMII Holdings, Inc.

30. Each of the communications and transmissions were made through the use of interstate commerce in the form of telephone and/or electronic mail transmissions and each such communication and transmission was made as part of the plan and scheme to defraud Plaintiff of $25,000.00.

31. Plaintiff is informed and believes and thereon alleges that Stephen Brown and Mary Brown are persons who operated, controlled, managed and directed UMII Holdings, Inc. as an enterprise intended to and which did engage in a scheme to defraud Plaintiff, and others, through the use of wire and mail fraud. UMII Holdings, Inc., did no other lawful business and its sole purpose was as a vehicle through which the Browns could receive investors funds.

32. Stephen Brown repeatedly engaged in false representations concerning the acts and activities of the enterprise (UMII Holdings, Inc.) from January 2012 through September 2012; repeatedly and falsely advised that the enterprise had business transactions which did not exist; repeatedly and falsely represented that the

enterprise was going to "go public"; and repeatedly and falsely represented that contracts existed with third parties which would be revenue generating for the shareholders of the enterprise.

33. There was no legitimate business function of UMII Holdings, Inc. and Plaintiff is informed and believes that the sole purpose of the enterprise was to fraudulently secure funds from Plaintiff and others through the use of interstate commerce and the United States mail and telephonic as well as internet email communications.

34. As a direct and proximate result of the predicate acts herein alleged and the fraudulent scheme engaged in by UMII Holdings, Inc. as an enterprise, as directed, managed and controlled by Stephen and Mary Brown as its owners, controllers, officers and directors, Plaintiff sustained injuries and damages in the sum of $25,000.00.

35. Plaintiff seeks treble damages pursuant to 18 U.S.C. § 1964 (c) and attorneys fees as provided thereunder according to proof.

Wherefore, Plaintiff prays for judgment against Defendants Stephen Brown, Mary Brown and UMII Holdings, Inc., as follows:

1. For securities fraud in violation of 15 U.S.C. § 77a, et seq. and violations of §10b of the Securities and Exchange Act of 1934, monetary damages in the sum of $25,000.00 plus interest according to proof;

2. For violations of 18 U.S.C. § 1964, et seq. (Civil Rico) the sum of $25,000.00 plus treble damages as provided for under 18 U.S.C. § 1964 (c);

3. For attorneys fees as provided for under 18 U.S.C. § 1964 (c)according to proof;

/ / /

/ / /

/ / /

1    4.   Such other or further relief as the court may allow.

2    Dated this 27th day of February, 2014.

3                                           **Jeffrey A. Cogan, Esq., Ltd.**

4

5                                           By: /s/ Jeffrey A. Cogan, Esq.
6                                               Jeffrey A. Cogan, Esq.
                                                Nevada Bar No.  4569
7                                               6900 Westcliff Drive, Suite 602
                                                Las Vegas, Nevada 89145
8                                               Attorney for Plaintiff, Robert M. Ross

**Exhibit 1**

*Purefruit*

**TRADEMARK LICENCE AGREEMENT**

THIS AGREEMENT is made on the **1st day of June 2011**     BETWEEN:

(1)  **TATE & LYLE TECHNOLOGY LIMITED** whose registered office is at Sugar Quay, Lower Thames Street, London EC3R 6DQ ("T&L"); and

(2)  **UMII PRODUCTS, INC.**

whose registered office is at **2850 W. Horizon Ridge Parkway, Suite 200, Henderson, NV 89052**

(the "Trademark User").

WHEREAS:-

(A)  T&L is the legal and beneficial owner of the Trademark.

(B)  The Trademark User wishes to obtain a licence from T&L with respect to the Trademark for the Product (as defined below), and T&L is willing and able to grant such licence, all on the terms and conditions set forth herein.

**1**     **Definitions**

1.1     "**Affiliates**" means with respect to any person, any other person controlling, controlled by or under common control with such person and "control" of a person shall mean direct or indirect ownership of more than 50% of the outstanding voting stock of a corporate person or voting interest in a non-corporate person.

1.2     "**Finished Products**" shall mean the Trademark User's products containing the Product listed on Exhibit A which may be amended by the parties from time to time in accordance with Clause 16 below;

1.3     "**Product**" means sweetening ingredients based on monk fruit extract;

1.4     "**Supply Agreement**" means the supply agreement between [T&L entity] and the Trademark User or its Contract Manufacturer (as the case may be) for the supply of the Product to the Trademark User;

1.5     "**Territory**" shall mean **United States.**

1.6     "**Trademark**" shall mean the trademarks, service marks, logos and/or graphics which are specifically set forth on Exhibit B; and

EXHIBIT A
1 of 11

1.7     **"T&L Authorised Distributor"** means a person or company or other entity authorised by T&L in writing to distribute the Product.

**2       Grant of Licence**

2.1     The Trademark User acknowledges and agrees that T&L is the beneficial owner of the Trademark.  The Trademark User may only use the Trademark in the Territory in advertising, packaging and promotional materials used in connection with the sale of the Finished Products.

2.2     Subject to Clause 2.1, T&L grants to Trademark User a non-exclusive, royalty-free right and licence to use the Trademark in the Territory to identify the Product as used in its Finished Products.  Trademark User shall have no right to sub-license its rights under this Agreement.

2.3     No licence to any patent is granted either expressly or impliedly by T&L to the Trademark User by this Agreement.

2.4     Except to the extent of the limited licence rights granted pursuant to this Agreement, nothing contained in this Agreement shall be construed to vest in the Trademark User any right, title or interest in or to the Trademarks.  The Trademark User acknowledges that any use of the Trademarks and the goodwill associated therewith shall inure solely to the benefit of T&L.

**3       Right to use the Trademark**

The parties acknowledge that the Trademark being licensed hereunder is intimately associated with the Product as manufactured and sold by T&L.  As such, Trademark User agrees that it shall not be entitled to use the Trademark unless all the Product contained in the Finished Product has been manufactured by T&L or on behalf of T&L according to its standards and specifications and purchased by Trademark User from T&L or a T&L Authorised Distributor. Trademark User shall not use the Trademark for any other use or in connection with any other products without the prior written authorisation of T&L.

**4       Other high-intensity sweeteners**

Notwithstanding the foregoing, Trademark User shall not use the Trademark in connection with any Finished Product which is a food or beverage, that contains aspartame and/or cyclamates and/or saccharin and/or neotame and/or sucralose and/or acesulfame-K and/or advantame any other high intensity sweetener that would require warning labels or information statements or is not approved by a regulatory agency as a designated sweetener for that country or is not considered 'natural' in that country.  In addition, Trademark User shall not use the Trademark in connection with any

EXHIBIT A
2 of 11

Finished Product that contains other high intensity sweeteners where the Product represents less than 50% of the total sweetness equivalent of the total sweetness provided by the high intensity sweeteners (including the Product) present in such Finished Products.

**5        Use**

5.1      Trademark User's use of the Trademark shall be in strict accordance with the Trademark Use Manual (the "Manual") (as may be changed from time to time by T&L), the receipt of which Manual is hereby acknowledged by theTrademark User.

5.2      In the event that T&L amends the Manual (a "Manual Amendment") and the change is either

5.2.1    required by law or regulatory agency ("Law"); or

5.2.2    determined by T&L to be necessary to preserve the goodwill, the brand equity and/or reputation in the Trademark from damage or harm which could occur in the absence of such a change,

Trademark User shall implement the change following notification to it of the Manual Amendment by T&L ("Notification") and shall destroy or suitably alter Trademark User's inventory or packaging, advertising and promotional materials. The implementation of such change, destruction or alteration shall, if so required by Law or T&L, occur immediately.   Otherwise, such implementation shall occur by no later than the date required by Law, or in the case of a change required by T&L, in line with the timing for such change made by T&L for its own products with respect to the Trademark provided that such period of time shall not exceed 120 days following Notification.

5.3      In the event of a Manual Amendment by T&L, except as set out in Clause 5.2 above, Trademark User shall have a reasonable period of time, not to exceed 120 days following Notification, to exhaust its existing inventory of Finished Products and any packaging, advertising or other promotional materials using the Product ("Existing Materials") in a manner not consistent with the Manual Amendment provided that:-

5.3.1    such Existing Materials complied with the then current Manual at the time such Existing Materials were created; and

5.3.2    all Finished Products, packaging, advertising, marketing and promotional materials run, printed, reproduced, developed or otherwise created after the Notification shall be in compliance with the Manual as amended.

3

**6**        **Covenants of the Trademark User**

6.1        Trademark User shall adhere to and obligate its contract manufacturers for the Finished Products to adhere to T&L's standards and specifications for the handling and storage of the Product, and the sweetness of the Finished Products, the receipt of which standards and specifications Trademark User hereby acknowledges.

6.2        Trademark User shall in all respects comply with all applicable laws, FDA requirements or its foreign equivalents and the Food Act 1990 requirements or its foreign equivalents as to the sale of the Finished Products in the Territory.

6.3        All packages, advertising and promotional material of Trademark User that use the Trademarks or make reference to being "Naturally Sweetened with PUREFRUIT™ monk fruit extract" must be reviewed and approved by T&L prior to production to confirm compliance with the Manual. In addition, a final version of the Finished Products and labels for such Finished Products using the Trademark must be reviewed and approved by T&L prior to market launch.

6.4        T&L shall have the right to inspect any production facilities of Trademark User or its contractors where any Finished Products containing the Product and using the Trademark, or any promotional, advertising, or packaging materials using the Trademark, are being manufactured or made for the purpose of determining that Trademark User is adhering to the requirements of this Agreement and the Manual.

6.5        The Trademark User acknowledges T&L's exclusive ownership of the Trademarks and all proprietary rights therein.  The Trademark User shall not:-

6.5.1      directly or indirectly contest or aid in contesting the validity, enforceability or ownership of the Trademarks or any mark similar thereto;

6.5.2      acquire or assert any trademark or other proprietary rights in the Trademarks or any mark similar thereto; or

6.5.3      harm, misuse or bring into disrepute the Trademarks or any marks similar thereto

           the uncured occurrence of one or more of the above shall be considered a breach of a material term or condition of this Agreement.

6.6        The Trademark User shall not register or attempt to register anywhere in the world any of the trademarks or any marks similar thereto.  In the event of any breach of the foregoing, the Trademark User agrees, at its own expense,

4

immediately to terminate the unauthorised registration activity and promptly execute and deliver, or cause to be delivered to T&L such assignments and other documents as T&L may require to transfer to T&L all right, title and interest in and to the registrations or applications involved.

6.7     The Trademark User shall not use the Trademarks or anything confusingly similar thereto or any part thereof in its business or corporate name or as proxy for corporate identity.

6.8     The Trademark User covenants and agrees that the Trademarks shall strictly be used to identify Product in Finished Products without modifications, and the Trademark User shall not permit any other party to use the Trademark:-

6.8.1   as a proxy for company or salesperson identification or be used in any other way to imply that it is the name of an entity; or

6.8.2   to identify ingredients other than the Product.

6.9     The Trademark User shall give T&L prompt written notice of any infringement, possible infringement, act of passing off or other similar act or other unauthorised use in respect of the Trademarks which may come to its attention.  The Trademark User shall cooperate with and give reasonable assistance to T&L in connection with any suits or proceedings against third party infringers of the Trademarks.

**7       Trademark Indemnity**

7.1     Trademark User shall indemnify, defend and hold harmless T&L and each of its Affiliates and officers, directors, employees and agents from and against any and all liability, damage, loss, cost or expense (including reasonable legal fees) arising out of any third party claims or suits for:-

7.1.1   personal injury resulting from Trademark User's willful, reckless or negligent act or omission in connection with the storage, shipment or promotion of the Product;

7.1.2   personal injury resulting from Trademark User's willful, reckless or negligent act or omission in connection with the manufacture, packaging, storage, sale, shipment, promotion or distribution of the Finished Products; and/or

7.1.3   Trademark User's infringement of any third party intellectual property right resulting from Trademark User's manufacture, use, promotion, advertising or sale of the Finished Products.

7.2     Any obligation to indemnify is conditional upon T&L (i) advising the Trademark User of any claim or proceeding, in writing, within fifteen (15) days

5



EXHIBIT A
5 of 11

after T&L has received notice of said claim or proceeding or within such a time frame as to not materially prejudice the rights of the Trademark User and (ii) assisting and cooperating with the Trademark User and its representatives in the defence of any such proceeding and/or any claim. The Trademark User party shall assume responsibility at its expense for the handling and defence of such claim or suit, including settlement.

7.3     Any indemnity given hereunder shall survive termination of this Agreement.

**8       Term**

Subject to the termination provisions of Section 12 below, the term of this Agreement shall be coterminous with the Supply Agreement in effect on the effective date of this Agreement.

**9       Contract manufacturers**

If the Trademark User uses one or more contract manufacturers to manufacture the Finished Products, the Trademark User shall require such contract manufacturers to comply with all the terms of this Agreement. The Trademark User shall remain bound by the obligations contained in this Agreement and shall be liable to T&L for any breaches or non-performance of this Agreement by such contract manufacturers.

**10      Limitation of Liability**

In no circumstance shall T&L be liable to Trademark User, Trademark User's Affiliates, or Trademark User's customers for special, indirect or consequential damages, including but not limited to lost profits, damage to goodwill or loss of business.

**11      Confidentiality**

Subject to the provisions of Clause 9, neither T&L nor Trademark User shall disclose any information concerning the terms or provisions of this Agreement, including any modification or amendment thereof, without the prior written approval of the other party unless such disclosure is required by law or by applicable stock exchange regulations and such approval cannot be reasonably and timely obtained.

**12      Termination**

12.1    This Agreement may or shall (as the case may be) be terminated as follows:

12.1.1  T&L may, in its sole discretion, terminate this Agreement upon six (6) months prior written notice to Trademark User;

6

EXHIBIT A
6 of 11

12.1.2    either party may terminate this Agreement in the event the other has breached this Agreement and such breach has not been cured by the defaulting party within sixty (60) days after notice of such breach by the non-defaulting party; or

12.1.3    either party may terminate this Agreement with immediate effect, if the other enters into, or becomes subject to, any bankruptcy, liquidation, reorganization or similar proceeding; or

12.1.4    this Agreement shall immediately terminate in the event that the Supply Agreement is terminated.

12.2    The Trademark User acknowledges that under the laws of certain countries in which the Trademarks may be registered, a registration may be cancelled unless sales of the Finished Products using the Trademarks occur within a certain time (usually three or five years) after the registration is filed.  If such registration is cancelled, the licences granted hereunder in such country in the Territory shall be immediately terminated to the extent that no common law rights for the Trademarks for the use of sweeteners based on monk fruit extract as an ingredient exist in such country or the continued usage of the same would infringe or otherwise violate any third party rights in such country.

12.3    Subject to Clauses 12.4 and 12.5 below, upon expiration or termination of this Agreement in whole or in part, the Trademark User shall immediately cease using the Trademarks or any marks similar thereto.  This obligation shall survive termination or expiration of this Agreement.

12.4    Subject to Clause 12.5, in the event that the Supply Agreement is terminated other than for breach, Trademark User shall have the right, for a reasonable period of time not to exceed 90 days following such termination (the "Sell-Off period"), to exhaust its existing inventory of Finished Products or packaging containing the Product that has been created prior to the date of such termination, provided that:-

12.4.1    Trademark User is at the time of such termination in full compliance with this Agreement; and

12.4.2    the exhaustion of existing inventory of Finished Products or packaging shall be carried out in accordance with this Agreement.

12.5    Trademark User shall not have the right during the Sell-Off Period to:

12.5.1    Use the Product in any advertising, marketing or other promotional materials or;

12.5.2   Manufacture, run, reproduce, print, develop or otherwise create any additional or new packaging containing the Product.

**13      Governing Law**

This Agreement shall be governed by and construed in accordance with English law.  Both parties hereby submit to the exclusive jurisdiction of the High Court In London.

**14      Injunctive Relief**

Each party has the right to seek and obtain from the appropriate court injunctive relief such as attachment, preliminary injunction, replevin or other interim measures to avoid irreparable harm, to maintain the status quo or to preserve the subject matter of the dispute.

**15      Notices**

Notices shall be in writing and deemed to have been given on the second day after posting, when posted by first-class, registered or certified mail, postage prepaid, or sent by nationally-recognized overnight courier, or on the date of delivery if delivered by hand delivery, to the address of the respective parties as follows: if to T&L to:  2200 E. Eldorado Street, Decatur, Illinois 62520, Attn; General Counsel; and if to Trademark User to the address set out above.

**16      Assignment**

T&L may assign all or any part of this Agreement to any entity.  In the event that Trademark User divests itself of any Finished Product, Trademark User may assign all or any part of this Agreement with respect to such divested Finished Product to the entity acquiring such Finished Product, provided such entity has assumed in writing Trademark User's obligations under this Agreement.  In all other instances, this Agreement may not be assigned by Trademark User without the prior written consent of T&L, which consent may be withheld in T&L's sole discretion.

**17      Modification; Entire Agreement**

No modification or amendment to this Agreement shall be effective unless in writing, signed by both parties, and referring explicitly to this Agreement.  This Agreement, including any modification thereof, constitutes the entire agreement of the parties with respect to the subject matter hereof.

8

18      **Severability**

In the event that any provision of this Agreement would be held in any
jurisdiction to be invalid, prohibited or unenforceable for any reason, such
provision as to such jurisdiction, shall be ineffective, without invalidating the
remaining provisions of this Agreement or affecting the validity or
enforceability of such provision in any other jurisdiction.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first
written above.

**TATE & LYLE TECHNOLOGY LIMITED**        **UMII PRODUCTS, INC.**

By: _____               By: _____
        [NAME]                                     Stephen Brown
Its: _____VP SALES NA_____               Its: _____
        [TITLE]                                    CEO, Umii Products, Inc

9

**EXHIBIT A**

FINISHED PRODUCTS

All flavors and package sizes of:

Umii Vitamin Water
Umii Fruit Juice

EXHIBIT A
10 of 11

**EXHIBIT B**

BRAND



11

**Exhibit 2**

## SUBSCRIPTION AGREEMENT
### Umii Holdings Inc.
#### *A Hawaiian Corporation.*

The undersigned (sometimes referred to herein as "Subscriber") hereby subscribes to purchase the number of shares of Common Stock (the "Shares") of Umii Holdings, Inc. a Hawaiian Corporation (the "Company") indicated below. The undersigned understands that, if accepted, its subscription is irrevocable, but that it may be rejected in the sole discretion of the Company, for any reason.

In consideration for the acceptance by the Company of this Subscription Agreement, the Subscriber hereby agrees, represents and warrants as follows:

1.       *Acceptance or Rejection of Subscription. The Company shall have the right to accept or reject this subscription in whole or in part. If rejected, the Subscriber's check and Subscription Documents (as defined below) shall be promptly returned to the Subscriber. If accepted, the Subscriber's check will be forwarded directly to the Company, and the Subscriber's Investor Questionnaire and Subscription Agreement (collectively referred to herein as the "Subscription Documents") will be retained by the Company.*

2.       **Closing.** If the Company has not received and accepted subscriptions and the closing date is not extended in the sole discretion of the Company for up to an additional ninety (90) days (the "Closing Date"), the Offering will terminate and any unaccepted investments in the possession of the Company and Subscription Documents shall be promptly returned to the Subscriber.

3.       **Agreement to Indemnify.** The Subscriber hereby agrees to indemnify and hold harmless the Company and all of its directors, officers, agents and employees from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they may incur (I) by reason of the Subscriber's failure to fulfill any of the terms and conditions of this Agreement, (ii) by reason of the Subscriber's breach of any of the Subscriber's representations, warranties or agreements contained herein or in the Investor Questionnaire, and (iii) with respect to any and all claims made by or involving any person, other than the Subscriber, claiming any interest, right, title, power or authority regarding the Subscriber's purchase of Shares. The Subscriber further agrees and acknowledges that this indemnification agreement shall survive any sale or transfer, or attempted sale or transfer, of any portion of the Subscriber's Shares or upon the Subscriber's death.

4.       **Representations, Warranties and Covenants.** The Subscriber hereby represents, warrants, and covenants that:

(i)       Subscriber acknowledges that the Shares have not been registered under the Securities Act with the Securities and Exchange Commission, nor have the Shares been registered or qualified for sale under the laws of any other jurisdiction (either within or outside of the United States).

(ii)      Subscriber is acquiring the Shares for Subscriber's own account and not for the account of others and for investment purposes only.

(iii)     All subsequent offers and sales of the Shares by Subscriber shall be made in compliance with the Securities Act, pursuant to registration under the Securities Act or pursuant to an exemption from such registration.

(iv)     Subscriber understands that the Shares are being offered and sold to it in reliance on specific exemptions from the registration requirements of U.S. federal and state securities laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings of Subscriber set forth in the Subscription Agreement and Investor Questionnaire in order to determine the applicability of such exemptions and the suitability of Subscriber to acquire the Shares.

1 | Page

(v)     Subscriber has adequate net worth and means of providing for his current needs and personal contingencies to sustain a complete loss of his investment in the Shares and has no need for liquidity in this investment.

(vi)    The Company has made available to Subscriber, its counsel and advisors, if any, the opportunity to ask questions of, and receive answers from the Company and its representatives, concerning the terms and conditions of an investment in the Shares, and has given it access to any requested information, documents, financial statements, books and records relative to the Company and an investment in the Shares.

(vii)   If the Subscriber is a corporation, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and if the Subscriber is a partnership or other organization, it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(viii)  (a) If the Subscriber is a corporation, the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action, (b) if the Subscriber is a partnership or other organization, the other governing documents to enter into this Agreement and to consummate the transactions contemplated hereby and all necessary consents and approvals required by the partnership agreement or other governing documents have been obtained, and (c) for both corporations and partnerships, this Agreement constitutes a legal, valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally.

(ix)    Subscriber is aware that investing in the Shares is speculative and involves a high degree of risk and that any right to transfer its Shares in the Company is limited and restricted by law, and this Subscription Agreement.

(x)     Subscriber has evaluated the risks of investing in the Shares and has substantial experience in making investment decisions of this type or is relying on his advisors or Purchase Representative, if applicable, in making this investment decision.

(xi)    Subscriber understands that the shares subject to this Subscription Agreement have been/will be registered under a Registration Statement on Form S-1, filed with the Securities and Exchange Commission, and until such Registration Statement has been declared effective by the Securities and Exchange Commission, a legend may be placed on any certificate representing the Shares.

The foregoing representations, warranties, and covenants and all other information which the Subscriber has provided to the Company concerning the Subscriber and the Subscriber's financial condition (or concerning the entity or organization which the subscriber represents and its financial condition) are true and accurate as of the date hereof.

5.      **Subscription Agreement Binding on Heirs, Etc.**  This Subscription Agreement shall be binding upon the Subscriber's heirs, successor's estate, legal representatives and assigns, and shall be construed in accordance with the laws of the State of Nevada.

6.      **Execution Authorized.**  If this Subscription Agreement and the other relevant Subscription Documents are executed on behalf of a corporation, partnership, trust or other entity, the Subscriber has been duly authorized and empowered legally to represent such entity and to execute this Subscription Agreement and such Subscription Documents and all other instruments in connection with the purchase of the Shares, and the Subscriber's signature is binding upon such entity.

7.      **Legal Representation/Conflict of Interest.**  The Subscriber, by executing this Subscription Agreement acknowledges, represents and agrees that (a) the Company has retained legal counsel to represent it in connection with the preparation of this Subscription Agreement, (b) such legal counsel has prepared such documents with a view to the interests of the Company only and has not undertaken to represent the interest of the Subscriber and that no attorney-client relationship or fiduciary duty exists between such legal counsel and the Subscriber, notwithstanding that the Subscriber's investment may pay, directly or indirectly, for such legal services; (c) the Subscriber has been advised to have such legal documents reviewed by the Subscriber's own independent attorney and/or other advisors; and (d) the services performed by such legal counsel have been limited to the preparation of such documentation at the

2 | P a g e

request and direction of the Company and such legal counsel has not undertaken to conduct any investigation whatsoever concerning the facts, risks or circumstances concerning or relating to the investment and/or the background or financial qualifications of the Company.

8.      **Governing Law, and Venue.** This Agreement shall be construed in accordance with, and governed by, the laws of the State of Nevada with venue proper in Nevada.

9.      **Definition of Terms.** The terms used herein, if not otherwise defined herein, shall have the meanings attributed to such terms in the Agreement. All pronouns and any variations thereof used herein shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons herein may require.

10.     **Number of Shares.** The undersigned hereby subscribes for Units as follows:
        485,000 Shares @ $0.01 per share.

11.     **Taxpayer Identification Number Certification.**

        45-0671118
        ―――――――――――――――
        Tax I.D. No.

3 | P a g e

I declare that the number shown in this Subscription Agreement is my correct taxpayer identification number and/or social security number (or I am waiting for a number to be issued to me), that I have read and understood the foregoing documents, and that I desire to purchase the shares herein under the terms set forth in this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this 26th day of January, 2012.

Subscriber: 75th Investment Group, Inc.

818-345-0404
Telephone Number                           Telephone Number

5930 Tampa Ave, #203
Street Address                             Street Address

TARZANA        CA
City            State        City        State
Zip  91356                   Zip

SUBSCRIPTION ACCEPTED:
Umii Holdings Inc.

By: _Stephen Brown_
President/CEO
Dated: January 25th, 2012

4 | P a g e

**Exhibit 3**

## SUBSCRIPTION AGREEMENT
### Umii Holdings Inc.
#### *A Hawaiian Corporation.*

The undersigned (sometimes referred to herein as "Subscriber") hereby subscribes to purchase the number of shares of Common Stock (the "Shares") of Umii Holdings, Inc. a Hawaiian Corporation (the "Company") indicated below. The undersigned understands that, if accepted, its subscription is irrevocable, but that it may be rejected in the sole discretion of the Company, for any reason.

**In consideration for the acceptance by the Company of this Subscription Agreement, the Subscriber hereby agrees, represents and warrants as follows:**

*1.       Acceptance or Rejection of Subscription. The Company shall have the right to accept or reject this subscription in whole or in part. If rejected, the Subscriber's check and Subscription Documents (as defined below) shall be promptly returned to the Subscriber. If accepted, the Subscriber's check will be forwarded directly to the Company, and the Subscriber's Investor Questionnaire and Subscription Agreement (collectively referred to herein as the "Subscription Documents") will be retained by the Company.*

2.       Closing.  If the Company has not received and accepted subscriptions and the closing date is not extended in the sole discretion of the Company for up to an additional ninety (90) days (the "Closing Date"), the Offering will terminate and any unaccepted investments in the possession of the Company and Subscription Documents shall be promptly returned to the Subscriber.

3.       Agreement to Indemnify.  The Subscriber hereby agrees to indemnify and hold harmless the Company and all of its directors, officers, agents and employees from any and all damages, losses, costs and expenses (including reasonable attorneys' fees) which they may incur (I) by reason of the Subscriber's failure to fulfill any of the terms and conditions of this Agreement, (ii) by reason of the Subscriber's breach of any of the Subscriber's representations, warranties or agreements contained herein or in the Investor Questionnaire, and (iii) with respect to any and all claims made by or involving any person, other than the Subscriber, claiming upon their interest, right, title, power or authority regarding the Subscriber's purchase of Shares. The Subscriber further agrees and acknowledges that this indemnification agreement shall survive any sale or transfer, or attempted sale or transfer, of any portion of the Subscriber's Shares or upon the Subscriber's death.

4.       Representations, Warranties and Covenants.  The Subscriber hereby represents, warrants, and covenants that:
(i)       Subscriber acknowledges that the Shares have not been registered under the Securities Act with the Securities and Exchange Commission, nor have the Shares been registered or qualified for sale under the laws of any other jurisdiction (either within or outside of the United States).
(ii)      Subscriber is acquiring the Shares for Subscriber's own account and not for the account of others and for investment purposes only.
(iii)     All subsequent offers and sales of the Shares by Subscriber shall be made in compliance with the Securities Act, pursuant to registration under the Securities Act or pursuant to an exemption from such registration.
(iv)      Subscriber understands that the Shares are being offered and sold to it in reliance on specific exemptions from the registration requirements of U.S. federal and state securities laws and that the Company is relying upon the truth and accuracy of the representations, warranties, agreements acknowledgments and understandings of Subscriber set forth in the Subscription Agreement and Investor Questionnaire in order to determine the applicability of such exemptions and the suitability of Subscriber to acquire the Shares.

1 | Page

EXHIBIT C
1 of 4

(v)     Subscriber has adequate net worth and means of providing for his current needs and personal contingencies to sustain a complete loss of his investment in the Shares and has no need for liquidity in this investment.

(vi)    The Company has made available to Subscriber, its counsel and advisors, if any, the opportunity to ask questions of, and receive answers from the Company and its representatives, concerning the terms and conditions of an investment in the Shares, and has given it access to any requested information, documents, financial statements, books and records relative to the Company and an investment in the Shares.

(vii)   If the Subscriber is a corporation, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and if the Subscriber is a partnership or other organization, it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(viii)  (a) If the Subscriber is a corporation, the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action, (b) if the Subscriber is a partnership or other organization, the other governing documents to enter into this Agreement and to consummate the transactions contemplated hereby and all necessary consents and approvals required by the partnership agreement or other governing documents have been obtained, and (c) for both corporations and partnerships, this Agreement constitutes a legal, valid and binding obligation of the Subscriber, enforceable against the Subscriber in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights generally.

(ix)    Subscriber is aware that investing in the Shares is speculative and involves a high degree of risk and that any right to transfer its Shares in the Company is limited and restricted by law, and this Subscription Agreement.

(x)     Subscriber has evaluated the risks of investing in the Shares and has substantial experience in making investment decisions of this type or is relying on his advisors or Purchase Representative, if applicable, in making this investment decision.

(xi)    Subscriber understands that the shares subject to this Subscription Agreement have been/will be registered under a Registration Statement on Form S-1, filed with the Securities and Exchange Commission, and until such Registration Statement has been declared effective by the Securities and Exchange Commission, a legend may be placed on any certificate representing the Shares.

The foregoing representations, warranties, and covenants and all other information which the Subscriber has provided to the Company concerning the Subscriber and the Subscriber's financial condition (or concerning the entity or organization which the subscriber represents and its financial condition) are true and accurate as of the date hereof.

5.      **Subscription Agreement Binding on Heirs, Etc.** This Subscription Agreement shall be binding upon the Subscriber's heirs, successor's estate, legal representatives and assigns, and shall be construed in accordance with the laws of the State of Nevada.

6.      **Execution Authorized.** If this Subscription Agreement and the other relevant Subscription Documents are executed on behalf of a corporation, partnership, trust or other entity, the Subscriber has been duly authorized and empowered legally to represent such entity and to execute this Subscription Agreement and such Subscription Documents and all other instruments in connection with the purchase of the Shares, and the Subscriber's signature is binding upon such entity.

7.      **Legal Representation/Conflict of Interest.** The Subscriber, by executing this Subscription Agreement acknowledges, represents and agrees that (a) the Company has retained legal counsel to represent it in connection with the preparation of this Subscription Agreement, (b) such legal counsel has prepared such documents with a view to the interests of the Company only and has not undertaken to represent the interest of the Subscriber and that no attorney-client relationship or fiduciary duty exists between such legal counsel and the Subscriber, notwithstanding that the Subscriber's investment may pay, directly or indirectly, for such legal services; (c) the Subscriber has been advised to have such legal documents reviewed by the Subscriber's own independent attorney and/or other advisors; and (d) the services performed by such legal counsel have been limited to the preparation of such documentation at the

2 | P a g e

EXHIBIT C
2 of 4

request and direction of the Company and such legal counsel has not undertaken to conduct any investigation whatsoever concerning the facts, risks or circumstances concerning or relating to the investment and/or the background or financial qualifications of the Company.

8.    Governing Law, and Venue.  This Agreement shall be construed in accordance with, and governed by, the laws of the State of Nevada with venue proper in Nevada.

9.    Definition of Terms.  The terms used herein, if not otherwise defined herein, shall have the meanings attributed to such terms in the Agreement.  All pronouns and any variations thereof used herein shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons herein may require.

10.   Number of Shares.  The undersigned hereby subscribes for Units as follows: 72,000 Shares @ $0.01 per share.

11.   Taxpayer Identification Number Certification.

45-0671118
Tax I.D. No.

3 | Page

EXHIBIT C
3 of 4

I declare that the number shown in this Subscription Agreement is my correct taxpayer identification number and/or social security number (or I am waiting for a number to be issued to me), that I have read and understood the foregoing documents, and that I desire to purchase the shares herein under the terms set forth in this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this 26th day of January, 2012.

Subscriber: Robert Koss

818-788-7007

Telephone Number                                                    Telephone Number


16133 Ventura Blvd., Suite 1145

Street Address                                                         Street Address


Encino, CA 91436

City                                       State          City                                       State
Zip                                                        Zip

SUBSCRIPTION ACCEPTED:
Umji Holdings Inc.

By:      Stephen Brown
         President/CEO
Dated: January 25th, 2012

4 | P a g e

EXHIBIT C
4 of 4

**Exhibit 4**



## Clear Channel and Dodgers Broadcast Sponsorship Agreement

THIS AGREEMENT is made and entered into on the DAY of MONTH, 2011 between Clear Channel ("Company") and CLIENT ("Sponsor" or "Advertiser").

THIS AGREEMENT establishes a seasonal sports marketing contract for sports marketing beginning April, 2012 and ending September 30, 2012 for English Dodgers broadcasts on AM 570 KLAC ("Station") during the 2012 regular seasons for the Los Angeles Dodgers ("Package").

THIS AGREEMENT may not be cancelled by either party, unless there is a material breach by the one of the parties and that party has failed to cure the material breach within fifteen (15) days after being given written notice by the other party with regard to such failure, or if such breach is deemed non-curable this AGREEMENT shall be terminated immediately.

### FINANCIAL COMMITMENT

Sponsor hereby purchases TOTAL AMOUNT net in sports marketing exposure in the 2012 seasons. For multiple year contracts, the net cost per season is AMOUNT.  Company shall bill Sponsor each season on a monthly basis from April through September.   Sponsor agrees to continue sponsorship should the Dodgers qualify for post season play.   Participation in post season play is mandatory at a rate of $1,500 per :30 Second PIP.

### REGULAR SEASON MEDIA & MERCHANDISE

**See attached media plan**

All standard advertising contract terms and conditions will apply to this agreement. Additional Terms and Conditions attached are incorporated herein by reference.

IN WITNESS WHEREOF, Station and Sponsor agree to the above as of the day and year above:

COMPANY:                                          All Sports Energy Drinks Inc:

                                                              3/21/2012

-------------------------------------             -------------------------------------

AM 570 KLAC AE/Manager      DATE          ( Authorized signatory)      DATE

                                                              STEPHEN BROWN, CEO



# Energy Drink Sponsorship For ALL SPORTS BEVERAGES INC Terms

## TERMS
- 27 week commitment.
- Campaign run dates Week of April 2, 2012 through October 3, 2012
- Total commitment:  $500,000.00 (Five Hundred Thousand Dollars)

- $200,000.00 due on or before April 2, 2012
- 5 x $60,000.00 due on or before the first of the month as follows:
  - May 1, $60,000.00
  - June1 , $60,000.00
  - July 1, $60,000
  - August 1, $60,000
  - September 1, $60,000.

EXHIBIT D
2 of 7



# Energy Drink Sponsorship For ALL SPORTS BEVERAGES INC Retail Activation

## Co-branding and Market Activation

ALL SPORTS BEVERAGES INC will receive the opportunity to showcase the Dodgers alliance via customized signage and retail activation at key accounts.
This includes:

- Use of Dodger Logos and Trade marks on all ALL SPORTS BEVERAGES INC beverages, packaging, marketing collateral, and retail displays.
- Use of the term "The Official Energy Drink of The LA Dodgers"  On all ALL SPORTS BEVERAGES INC products
- ALL SPORTS BEVERAGES INC and the Dodgers will design promotional initiatives and store incentives to create a stronger connection with consumers and sell more product through stores.

EXHIBIT D
3 of 7





# Energy Drink Sponsorship For
# ALL SPORTS BEVERAGES INC
# In Stadium Elements

## Hospitality for key accounts/employees

ALL SPORTS BEVERAGES INC will receive:

- Four (4) Tickets for 40 games in the exclusive Dugout Club.
- 2 complimentary VIP parking passes for 40 games.
- ALL SPORTS BEVERAGES INC will also receive the opportunity to entertain up to thirty (30) select guests during six (6) games in our exclusive United Club Suites. VIP Parking included.

## Strategic Events

ALL SPORTS BEVERAGES INC will receive the opportunity to leverage Dodger Stadium for special events.  This includes:

- parking providing nearly 20,000 spaces, and the Stadium.
- ALL SPORTS BEVERAGES INC and the Dodgers will work together to create events as required.
  - All events subject to dodger approval.





# Energy Drink Sponsorship For
# ALL SPORTS BEVERAGES INC
# In Stadium Elements

## Outfield Wall LEDs
ALL SPORTS BEVERAGES INC will receive Two (2) 7' x 24' positions on the outfield wall in left field and right field displayed simultaneously for one half-inning each game. Prominently visible to in stadium audience as well as local and national TV audience

## Dodgers Fan Fest
The Dodgers will celebrate the 50th Anniversary of Dodger Stadium through a full scale Fan Fest. This six-hour event will take place prior to the Dodgers vs. Cardinals games on Saturday, May 19th.
•ALL SPORTS BEVERAGES INC will receive the opportunity to entertain thousands of fans through a customized interactive footprint/activation zone.
•ALL SPORTS BEVERAGES INC Product sampling and any other brand initiatives will be included with brand sales on site.

## Viva Los Dodgers
•ALL SPORTS BEVERAGES INC will sell product within the Vendor Village footprint of these events.

EXHIBIT D
5 of 7



# Energy Drink Sponsorship For
# ALL SPORTS BEVERAGES INC
# In Stadium Elements

## Stadium Pouring

ALL SPORTS BEVERAGES INC product will be showcased and sold at a minimum of twenty (20) concession stands in addition to twenty (20) portable stands and all clubs environments for all Dodger Stadium events including:

- 81 Home Games + 2 Exhibition Games
- Dodgertown Classic – College Baseball game between USC + UCLA
- Monsterjam and Supercross
- Concerts + Music Festivals
- Additionally ALL SPORTS BEVERAGES INC fridges and product will be displayed in key areas of the stadium including: Stadium Club (500ppl), Dugout Club (900ppl), and both baseline clubs (1,600ppl)
- ALL SPORTS BEVERAGES INC would also be branded on menu boards and concession guides.

## Club House

ALL SPORTS BEVERAGES INC will receive the opportunity to showcase a fridge within the Dodgers Clubhouse in addition to making product available to all players during workouts and games.





# Energy Drink Sponsorship For ALL SPORTS BEVERAGES INC Broadcast Elements

| Element | Per Game | # of Games | Total Spots |
|---|---|---|---|
| Pre-game :30 | 2 | 162 | 400 |
| In-game :30 | 2 | 162 | 700 |
| Post-game :30 | 1 | 162 | 400 |
| Top of 6th live drop :15 | 1 | 162 | 300 |
| Feature* | 1 | 162 | 300 |

* "The ALL SPORTS BEVERAGES INC Catch of the Day"

Total In-game, pre-game, post-game spots: 2,100

